J-A23008-16

2016 PA Super 236

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| Appellee | : | |
| v. | : | |
| A.R.C. | : | |
| Appellant | : | No. 1296 WDA 2015 |

Appeal from the Judgment of Sentence April 1, 2015
In the Court of Common Pleas of Greene County
Criminal Division at No(s): CP-30-CR-00000032-2014

BEFORE:  LAZARUS, J., STABILE, J., and STRASSBURGER, J.[*]

OPINION BY LAZARUS, J.:                      **FILED NOVEMBER 1, 2016**

A.R.C. appeals from her judgment of sentence,[1] entered in the Court of Common Pleas of Greene County, after being convicted by a jury of endangering the welfare of a child (EWOC)[2] (M-1) and recklessly endangering another person (REAP)[3] (M-2), as a result of injuries sustained

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Although A.R.C. appealed from the order denying, by operation of law, her post-sentence motions, the appeal properly lies from her underlying judgment of sentence. **Commonwealth v. Chamberlain**, 658 A.2d 395 (Pa. Super. 1995) (order denying post-sentence motion acts to finalize judgment of sentence; thus, appeal is taken from judgment of sentence, not order denying post-sentence motion).

[2] 18 Pa.C.S. § 4304(a)(1).

[3] 18 Pa.C.S. § 2705.

by her two-month-old daughter, M.S. Because the Commonwealth failed to prove, beyond a reasonable doubt, that A.R.C. engaged in reckless conduct that placed M.S. in danger of serious bodily injury or that she violated her parental duty of care to M.S., we vacate the judgment of sentence and discharge A.R.C..

The victim, M.S., is the infant daughter of A.R.C and her then-boyfriend, B.S. A.R.C. and B.S. began dating when A.R.C. was 14 years old and B.S. was 19 years of age. Prior to M.S.'s birth, B.S. moved into A.R.C.'s family trailer where she lived with her sister and mother. M.S. was born on May 22, 2013, via C-section. Over the first two months of M.S.'s life, A.R.C. took the infant to all of her regularly-scheduled pediatric well visits. At each of her doctor visits, M.S. was given a full-body examination which consisted of, in part, checking the child's musculoskeletal system. Doctors never noted any positive findings or any serious medical issues.[4]

A.R.C. returned to work as a hotel housekeeper approximately one month after M.S. was born. A.R.C. worked five days a week, which often included Saturdays. A.R.C. testified that her typical work hours were from 8 to 4. When A.R.C. returned to work, B.S. became M.S.'s primary caretaker. On the evening of July 29, 2013, M.S. awoke; after changing her diaper, B.S. left the infant on the bed while he went to the bathroom. When B.S.

_____

[4] M.S. was diagnosed with thrush and impetigo in her first month of life; she was successfully treated with antibiotics and a topical cream.

returned to the bedroom he saw the couple's dog on the bed near the baby. In an attempt to push the dog off the bed, B.S. fell on M.S. Due to the force of B.S. on her body, M.S. cried, which awoke A.R.C.. "Half asleep,"[5] A.R.C. suggested B.S. give the baby a bottle and then went back to sleep.

When A.R.C. arrived home from work the next evening, B.S. was applying ice to the baby's swollen and red leg. As soon as A.R.C.'s mother arrived home from work, the couple took M.S. to the hospital, where she was ultimately diagnosed with a newly fractured femur. Full body x-rays determined that M.S. had 17 other fractures, including broken ribs and limbs, which were in some stage of the healing process. Doctors determined that those other injuries occurred sometime within the last three weeks of the current hospital visit.

B.S. initially told hospital personnel and Child and Youth Services' employees that one of their dogs had jumped on the bed and injured M.S. Eventually, B.S. admitted to falling on the baby the prior evening, as well as having dropped the baby out of her infant car seat when she was just weeks old. B.S. was charged with REAP, EWOC, simple assault and aggravated assault. In a separate proceeding, B.S. pled guilty to REAP, EWOC and simple assault and was serving a prison sentence at the time of A.R.C.'s trial.

---

[5] *See* N.T. Jury Trial, 2/14/15, at 263.

The Commonwealth ultimately charged A.R.C. with REAP, EWOC, and simple assault. At the close of the Commonwealth's case, the defense moved for a directed verdict claiming that there was insufficient evidence to put the case before the jury. Finding that there "is more than a scintilla of evidence against [A.R.C.] as a matter of law," the court denied the defense motion. N.T. Jury Trial, 2/14/15, at 233. The jury eventually rendered a guilty verdict for REAP and EWOC. A.R.C. was sentenced on April 2, 2015, and ordered to serve a flat sentence of 60 days of incarceration, followed by a consecutive term of 36 months of County Intermediate Punishment which includes 30 days of house arrest to an approved address, with GPS monitoring, followed by 33 months of regular supervision, to include attending monthly re-entry court proceedings for up to six months. In addition, A.R.C. was ordered to serve 300 hours of community service.

On April 10, 2015, A.R.C. filed timely post-sentence motions[6] that were denied by operation of law on August 17, 2015. **See** Pa.R.Crim.P. 720(B)(3)(a). This timely appeal follows, in which A.R.C. presents the following issues for our consideration:

(1) Whether the evidence at trial was insufficient to establish beyond a reasonable doubt the "specific intent" and "actus

_____

[6] On May 8, 2015, A.R.C. filed a "Motion for Continued Stay of Sentence," which the court granted on May 11, 2015. In its order, the trial court stayed A.R.C.'s sentence "pending the disposition of post-sentence motions and through all avenues of direct appeal [in the] Superior Court." Order, 5/11/15.

reus" elements of the crimes charged when the undisputed evidence established that the Defendant did not cause or know about the injury to the child, that she proactively took the child to the hospital repeatedly, that doctors did not discover apparently existing injuries during repeated examination, and that an expert testified there was nothing more the Defendant could have done to discover that the child was injured.

(2)     Whether the verdict was against the weight of the evidence when, to the exclusion of all of the evidence of the proactive efforts of the Defendant, the testimony of an expert that over eight of his colleagues did not discover the injuries to the child and the Defendant could not have done anything more to discover them, and the testimony of the perpetrator of the injuries that he lied to the Defendant about injuring the child, excessive and undue weight was placed on the mere existence of the injuries and that the Defendant was the child's mother.

(3)     Whether the lower court erred in failing to grant the Defendant's Petition to Strike and thereby relied on unverified facts, facts not of record, and information inapposite to the testimony at trial in denying the Defendant's Post-Verdict Motions for Judgment of Acquittal and for New Trial?

(4)     Whether the lower court abused its discretion in failing to modify the Defendant's sentence because (1) the court failed to rule on the Defendant's Petition to Strike and admitted into the record and relied on unverified facts, facts not of record, and information entirely inapposite to the testimony at trial in sentencing the Defendant, and (2) it admitted an unverified, hearsay letter that was authored by a biased individual who was not present for cross-examination, did not qualify as a victim impact statement, and was replete with inaccurate statements of "facts," opinions and even legal and medical conclusions.

(5)     Whether the lower court abused its discretion by issuing an excessive and unreasonable sentence that was inconsistent with the Sentencing Code and contrary to fundamental norms of sentencing because it (1) considered only the seriousness of the crimes charged to the exclusion of statutory guidelines, recommendations of the presentence

investigation, mitigating factors, and the specific facts of the case, (2) misapplied the law in failing to properly identify mitigating factors and relied on inaccurate information and unsubstantiated hearsay, and (3) imposed conditions which were outside the power and control of the Defendant.

In **Commonwealth v. Smith**, 956 A.2d 1029 (Pa. Super. 2008) (en banc), our Court set forth the relevant standard of review for a sufficiency claim:

The standard we apply when reviewing the sufficiency of the evidence is whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the factfinder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the factfinder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence. Furthermore, when reviewing a sufficiency claim, our Court is required to give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

However, the inferences must flow from facts and circumstances proven in the record, and must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of an accused's guilt beyond a reasonable doubt. The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fail even under the limited scrutiny of appellate review.

*Id.* at 1035-36 (citation and internal quotation omitted).

The crime of Endangering the Welfare of Child is defined, in relevant part, as:

> A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense *if [s]he knowingly endangers the welfare of the child by violating a duty of care, protection or support.*

18 Pa.C.S. § 4304(a)(1) (emphasis added). The crime of endangering the welfare of a child is a specific intent offense. The intent element under section 4304 is a knowing violation of a duty of care. *See Commonwealth v. Cardwell*, 515 A.2d 311, 313 (Pa. Super. 1986); *see also Commonwealth v. Smith*, (Pa. Super. 2008) (three-prong standard to prove knowing element of intent of EWOC: (1) accused must be aware of duty to protect child; (2) accused must be aware that child is in circumstances that could threaten child's physical or psychological welfare; and (3) accused either must have failed to act, or must have taken action so lame or meager that actions cannot reasonably be expected to protect child's welfare).

In *Cardwell*, an EWOC case involving a mother's failure to protect her child from another person's severe abuse, our Court looked to section 302 of the Crimes Code to conclude that violating a duty of care under the EWOC statute includes omissions to act, as well as acts. *Id.* at 314. The Court stated, "Where there is a duty of care and where there is sufficient evidence that the parent knows that the action is required to fulfill his or her parental

duty, than a failure to act may be a knowing failure in the parent's duty of care." ***Id.  See Commonwealth v. Barnhart***, 497 A.2d 616, 620-21 (Pa. Super. 1985) ("A parent is charged with the duty of care and control, subsistence and education necessary for the child's physical, mental and emotional health and morals.").

Here, the trial judge justified the jury's EWOC and REAP verdicts as follows:

> The Jury did what a Jury is supposed to do.  Twelve members of our community considered all of the evidence against the Defendant, and they considered all of the evidence for the Defendant.
>
> The Jury found the Defendant guilty at Count 1 of Endangering the Welfare of Baby [M.], and at Count 2, Recklessly Endangering her well-being.
>
> The Commonwealth never charged the Defendant with actually causing the several injuries to Baby [M.].  **They charged the Defendant with endangering her baby by neglecting her, and also being reckless with her.**
>
> No one has to date, including the Defendant, and throughout all of the Pre-Trial and tribulations of the dependency or the criminal prosecution in this matter, ever disputed the obvious: That if an x-ray shows a trained doctor, that a two[-]month[-]old baby has 18 broken bones, and there is no accident to explain the injuries, that the injuries do quietly and simply, but powerfully speak for themselves.

N.T. Sentencing Order, 4/2/15, at 2.[7]

_____

[7] We note, with disapproval, that the trial judge chose not to write a Pa.R.A.P. 1925(a) opinion.  Instead, he stated that he "stands by [the court's] previously filed opinion and no further additions shall be filed at this time."  Order, 12/7/15.  We find this troubling given that not only did the
*(Footnote Continued Next Page)*

- 8 -

Instantly, there is nothing in the record to prove, beyond a reasonable doubt, that A.R.C. either recklessly endangered M.S. or acted in such a way that her neglect endangered M.S.'s welfare. To uphold her duty of parental care, A.R.C. took M.S. to every scheduled well-check and voluntarily took M.S. to the doctor when she seemed excessively fussy at 52-days-old. The doctors told A.R.C. that M.S. was likely suffering from colic, a normal condition in newborn infants. A.R.C. complied with the doctors' treatment for M.S.'s thrush and impetigo by administering her antibiotics and topical cream. None of M.S.'s healthcare providers either suspected or discovered any of the baby's injuries prior to her July 30th hospital visit where she was first diagnosed with a broken femur and 17 pre-existing fractures.

Doctors testified that M.S. was a healthy, thriving baby girl at all of her visits. Moreover, the evidence showed that A.R.C. had no idea that M.S. had sustained any injuries prior to her July 30th hospital visit. N.T. Jury Trial, 1/14/15, at 17 (arresting officer testified that there was no evidence, testimony or information discovered during investigation to show that, prior to July 29th, A.R.C. was aware that M.S. had suffered any injury). In fact, A.R.C. only became aware that M.S.'s leg was swollen and red when she arrived home from work on the evening of the 30th and saw B.S. applying ice

_(Footnote Continued)_ _____

court ask A.R.C. to file a Pa.R.A.P. 1925(b) concise statement of reasons for appeal, but, additionally, the trial court did not issue any opinion on A.R.C.'s post-trial motions that were denied by operation of law.

to the baby's limb. *Id.* at 276 (A.R.C. was not "fully awake" when the injury to M.S.'s leg happened); *id.* at 263 ("I was shocked, confused, upset in a way because I did not understand why he was [applying ice to the baby's leg and did not know] what happened."). In fact, A.R.C. testified that when she left for work on the morning of the 30th, M.S. was sleeping in her bassinette. N.T. Jury Trial, 1/14/15, at 262, 277.

Additionally, both B.S. and A.R.C.'s mother testified that they never saw A.R.C. mistreat the baby, nor did A.R.C. know that the baby had fallen out of the car seat when she was only a few weeks old. *Id.* at 94, 259. A.R.C. testified that she had never observed B.S. lose his temper with M.S., injure M.S. or place her in any risk of danger. *Id.* at 275-76. She also testified that she was not aware of anyone else who ever injured or placed M.S. in risk of danger. *Id.* at 276. Finally, A.R.C. testified that she never left M.S. in the care of someone incompetent to care for her daughter. *Id.*

Jeffrey Lancaster, M.D., the attending physician on duty when M.S. was admitted to the hospital for her broken femur, testified: "Outside of normal maternal instinct, which [A.R.C.] appears to have exhibited when she says my baby is irritable, I don't think there is really much else with these injures that she could have done." *Id.* at 161. Moreover, A.R.C.'s mother, who lived in the same small trailer with the couple and M.S., testified that the baby was generally pleasant, only waking to feed a couple times at night. Even on the evening of the 29th when M.S.'s leg was fractured, A.R.C.'s mother and A.R.C. testified that the baby's cry was no different than

any other night when she would wake to feed. *Cf. Commonwealth v. Cottam*, 616 A.2d 988 (Pa. Super. 1992) (where defendants'-parents' son died of starvation and malnutrition, appellants convicted of EWOC for violating duty of care where father told officers he had not made right decision, had let situation go too far, should have gone for help, mother did not want children to spend money on food, parents told children if they went to neighbors to beg for food they would be taken away from them, and they were aware that son's arm had gone numb a few weeks prior to death and did nothing about it).

Under such circumstances, we find that the Commonwealth did not prove beyond a reasonable doubt that A.R.C. was aware that M.S. was placed under circumstances that could threaten her physical welfare or that she failed to act to protect M.S.'s welfare. *Smith*, *supra*. Therefore, A.R.C.'s EWOC conviction is infirm and must be vacated.

The crime of REAP is defined as:

> A person commits a misdemeanor of the second degree if [s]he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury.

18 Pa.C.S. § 2705. The *mens rea* required for the crime of REAP, "recklessly," is defined as a conscious disregard of a known risk of death or great bodily harm to another person. *Commonwealth v. Chapman*, 763 A.2d 895 (Pa. Super. 2000). Acts of commission or omission by parents towards their children may create a substantial risk of death or great bodily injury. *Cottam*, 616 A.2d at 993.

Similar to the dearth of evidence to prove EWOC, the Commonwealth also failed to produce sufficient evidence to show that A.R.C. recklessly endangered M.S. A.R.C. neither knew nor should have known that M.S. had suffered 18 fractures prior to being told the results of the hospital's July 30th x-ray examination. A.R.C. took M.S. to all of her well checks throughout the relevant time period, brought M.S. to the doctor's office when she was concerned that she was overly fussy, and performed the usual parental duties as the mother of a newborn (baths, feedings, diaper changes, administering prescribed medications, etc). Plainly stated, there is no evidence in the record to show that A.R.C. consciously disregarded a known risk of great bodily harm to M.S. *Cf. Cottam*, *supra* (where defendant-parents were under mistaken belief that only prayer would aid their dying, malnourished son, mens rea element of REAP still proven; appellants knew son was near death, and did not seek aid). Doctors testified that all 18 injuries were sustained after A.R.C. went back to work, post-birth, and when M.S. was primarily cared for by B.S.. N.T. Jury Trial, 1/14/15, at 221, 245.

The trial court correctly noted that this is an unusual case in that no one has been able to account for how M.S. sustained 17 of her 18 undisputed, non-accidental fractures. However, just because those injuries were not traceable to a specific person or event, criminal liability is not automatically imputed to a parent. The Commonwealth is still required to prove, beyond a reasonable doubt, the elements of REAP and EWOC. The Commonwealth failed to sustain its burden of proof in the instant case.

Judgment of sentence vacated. Defendant discharged. Jurisdiction relinquished.[8]

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/1/2016

---

[8] Because we vacate and remand for discharge on sufficiency grounds, we need not address A.R.C.'s remaining issues on appeal.