J-S36036-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                                                 :  PENNSYLVANIA
                                                 :

             v.  :

K.B.  :

           Appellant  :  No. 1782 WDA 2019

Appeal from the Judgment of Sentence Entered November 6, 2019
In the Court of Common Pleas of Mercer County Criminal Division at
No(s):  CP-43-CR-0000513-2018

BEFORE:  OLSON, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:  FILED SEPTEMBER 15, 2020

K.B.[1] appeals from the judgment of sentence imposed in the Court of Common Pleas of Mercer County (trial court).  Specifically, she challenges the sufficiency of the evidence to support her jury conviction of Endangering the Welfare of Children (EWOC), 18 Pa.C.S. § 4304(a)(1).[2]  We affirm.

I.

We take the following factual background and procedural history from the trial court's November 6, 2019 opinion and our independent review of the

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] To protect the minor child's identity, we have amended the caption and will use the involved parties' initials throughout this decision.  See I.O.P. 424(A).

[2] The jury found K.B. not guilty of Recklessly Endangering Another Person, (REAP), 18 Pa.C.S. § 2705.

record. On May 18, 2018, the Commonwealth filed an information charging K.B. with EWOC and REAP related to her infant child (Child). The case proceeded to a jury trial on March 19, 2019.

A.

At trial, the Commonwealth presented five witnesses, including Dr. Jennifer Wolford, who testified as an expert in child abuse pediatrics and pediatric radiology, and Pennsylvania State Trooper Tyler Craig. K.B. testified on her own behalf.

1.

Dr. Wolford testified that on August 21, 2017, K.B. brought Child, then four-months old, to Children's Hospital due to swelling and redness on her thigh. (See N.T. Trial, 3/19/19, at 8-9, 15). K.B. advised the hospital staff that the symptoms had begun the previous day, but that she waited overnight to see if they would subside before bringing Child for evaluation. (See id. at 14-15).

At Children's Hospital, x-rays and a medical examination reflected that Child had multiple injuries, including 22 rib fractures, a broken femur, a broken tibia, a broken clavicle and bruising on the chest and mid-back. (See id. at 41-43). The injuries were in various stages of healing, ranging from the recent acute femur break that was causing the redness and swelling in the Child's thigh to some of the rib fractures that were more than 15 days' old and

were partially healed. (See id. at 21, 39-40). Child was tiny for her age and at the very bottom of the weight curve. (See id. at 19).

Because of the injuries' serious nature and the concern for child abuse or mistreatment, the matter was referred to Dr. Wolford and to the Division of Child Advocacy. (See id. at 9, 12-13). Dr. Wolford performed a history with K.B. and Child's father, M.D., to determine Child's medical and social histories, and for them to provide details about any incidents that might have caused injury or illness to her. (See id. at 10-11).

In an effort to explain the femur break and rib fractures, K.B. told Dr. Wolford that three days before Child's admission, a 70-pound dog had jumped on her, and that four weeks before admission, Child had fallen from a rocking chair. (See id. at 15). M.D. was concerned that he might have caused Child's rib fractures when he was holding her, but neither K.B. nor M.D. could explain the bruising to her chest and back. (See id. at 16). Dr. Wolford stated the incidents described by K.B. would not cause Child's injuries and that there was no reasonable accidental trauma event that could account for the fractures. (See id. at 42). She opined that a femur break in a four-month old infant is not normal, and that Child's break went through the bone, which would have caused her to cry "very significantly" when it occurred. (Id. at 42; see id. at 12, 15, 21). Dr. Wolford's expert medical opinion was that the bruising on her back and chest were concerning for possible child abuse, the 22 rib fractures were "virtually diagnostic on their own of physical child abuse[,]"

and the leg fractures without explanation provided raised "serious concerns for abuse." (Id. at 42; see id. at 17-18, 43). She expressed her fear that Child could suffer death or serious bodily injury if she remained in the same environment, characterizing the amount of violence she had suffered as frightening. (See id. at 42-43, 46).

Dr. Wolford also stated that with these types of injuries, an infant would show numerous signs and exhibit certain responses, such as excessive fussiness, lack of eating, small size, swelling in the injury areas, pain during diaper changes, and excessive sleeping to minimize pain; even routine care would be difficult. (See id. at 71-72, 75). She opined that the broken tibia and femur would have resulted in several days of visible swelling. (See id. at 72-73). She testified that because the infant Child is unable to communicate verbally yet, it is up to the parent to identify any issues, including pain and injuries, and communicate them to physicians. (See id. at 35). Only if a parent provides full information will a pediatrician know that there is a need to look deeper by performing x-rays. (See id. at 36). When asked about the well-visits with the Child's pediatrician, Dr. Duffy, on July 20th and August 15th that K.B. brought Child to, she explained that unless K.B. told the pediatrician information such as Child was not moving her leg normally, she was fussy or it was painful to change her, a typical well-visit exam would not have revealed the injuries. (See id. at 36, 113-14). Because the tibia fracture was weeks old, it "places it right between those two visits," so it would have been in a

state of healing when Child saw the doctor. (Id. at 114). Dr. Wolford was concerned that Child's adult caretakers were not ensuring Child's safety based on the gravity and extraordinary violence that she endured. (See id. at 113-14).

2.

Trooper Craig testified that he conducted a voluntary interview with K.B. and M.D. at Children's Hospital on August 22, 2017. (See N.T. Trial, 3/20/19, at 15-16). K.B. discussed possible explanations for the injuries, including the jumping dog and the rocking chair fall she had related to Dr. Wolford, as well as an incident in which K.B. dropped Child when she broke her ankle while carrying Child in a carrier. (See id. at 18-21). K.B. also told Trooper Craig that "there were times that [M.D.] would become frustrated, that he wouldn't be able to deal with the baby." (Id. at 23). For example, when K.B. was in the shower, M.D. would leave the crying Child outside the shower until K.B. could handle her, and she did not know what happened while she was at work, but she expressed concern "that if [M.D.] did become frustrated and [K.B.] wasn't present, that he would have no one to hand off [Child] to." (Id. at 24; see id. at 23).

In a second interview with Trooper Craig in October 2017, K.B. said that she felt foolish that she had not observed that there was a problem with Child and that there was a disconnect between the infant and M.D. (See id.). She stated that sometimes M.D. would leave Child unattended while he did another

task in the house. (See id.). When asked whether she suspected abuse, K.B. answered that she felt "foolish" and "stupid" for not realizing what was happening. (Id. at 25). She told the Trooper that she was sometimes concerned that M.D. was too rough with the Child, such as when he would toss Child in the air before catching her and when she saw him roughly apply lotion to her. (See id.). She also saw that Child cried more when M.D. held her than she did when held by anyone else. (See id.).

3.

K.B. testified that over the first four months of her life, including in the weeks up to the incident in question, Child saw two pediatricians. (See id. at 72, 81). K.B. explained that she had concerns about Child's low birth weight, tiny size and lack of weight gain, and that this was the only concern raised by the pediatricians. (See id.). As to M.D., K.B. explained that he was Child's primary caregiver while she was at work. (See id. at 82). She said that it would concern her when M.D. would play with the Child by tossing her up in the air, but she responded, "no," when asked if she believed M.D. would hurt Child, and that she did not observe any physical abuse. (See id. at 73, 75-79).

B.

At the close of the Commonwealth's case, the trial court denied K.B.'s oral motion for a directed verdict. After the jury convicted K.B. of one count of EWOC and found her not guilty of REAP, K.B. moved for a judgment of

acquittal that the trial court denied. On June 6, 2019, the court sentenced K.B. to a term of incarceration of not less than three nor more than six months, plus six months of probation. The court denied her post-sentence motion and K.B. timely appealed. Both she and the court have complied with Rule 1925. See Pa.R.A.P. 1925.

## I I.

On appeal, K.B. challenges the sufficiency of the evidence[3] to support her conviction of EWOC because the Commonwealth failed to provide evidence of mens rea to support the conviction. (See K.B.'s Brief, at 11-17). She maintains that "she was not aware of any circumstances that placed [Child] in physical or psychological danger[]" and, upon discovering "an issue . . . to the health of [Child], she brought [her] directly to the hospital to be

_____

[3] In reviewing the sufficiency of the evidence, we consider:

> whether the evidence, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to enable a reasonable jury to find every element of the crime beyond a reasonable doubt. The entire trial record must be evaluated and all evidence actually received must be considered, whether or not the trial court's rulings thereon were correct. Moreover, the Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Finally, the trier of fact, while passing upon the credibility of witnesses and the weight to be afforded the evidence produced, is free to believe all, part or none of the evidence.

Commonwealth v. Bryant, 57 A.3d 191, 197 (Pa. Super. 2012) (citations, quotation marks and brackets omitted).

examined." (K.B.'s Brief, at 17); (see id. at 14, 16). K.B. argues that it also is relevant that she never admitted to either abusing Child or knowing that M.D. was doing so, while M.D. admitted that he might have unintentionally injured her and acknowledged that K.B. did not have any knowledge of abuse. (See id. at 15).

A.

Section 4304(a)(1) of the Crimes Code provides, in relevant part, "a parent, guardian or other person supervising the welfare of a child under 18 years of age . . . commits [the] offense [of EWOC] if he knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S. § 4304(a)(1). EWOC is a specific intent offense that requires the alleged offender to knowingly violate his or her duty of care. See Commonwealth v. Lynn, 114 A.3d 796, 819 (Pa. 2015). This intent element requires that the Commonwealth establish:

> (1) the accused is aware of his/her duty to protect the child; (2) the accused is aware that the child is in circumstances that could threaten the child's physical or psychological welfare; and (3) the accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare.

Id. (citations omitted). "[I]t is the awareness by the accused that [her] violation of [her] duty of care, protection and support is 'practically certain' to result in the endangerment to [her child's] welfare, which is proscribed by the statute." Commonwealth v. Wallace, 817 A.2d 485, 492 (Pa. Super. 2002),

appeal denied, 833 A.2d 143 (Pa. 2003), cert. denied, 541 U.S. 907 (2004) (citing 18 Pa.C.S. § 302(b)(2)).

B.

K.B. admits that she had a duty to protect Child. (See K.B.'s Brief, at 17). Her argument is that the Commonwealth failed to establish the second and third prongs and, therefore, the required mens rea. After a thorough review of the record, we disagree. (See id. at 14-17).

Dr. Wolford provided detailed testimony about the extensive injuries for which K.B. provided no reasonable explanation and the signs and symptoms that an infant suffering from such severe trauma would exhibit. She testified that K.B. either knew or should have been aware of these numerous signs and responses, and that it was her duty to realize that something was wrong based on them. She also explained that it was K.B.'s duty to act by communicating this behavior to the pediatrician, and why the failure to do so meant that the doctor would not discover the injuries. Furthermore, K.B.'s statements to Trooper Craig that M.D. would toss Child into the air and roughly apply lotion to Child, that there was a disconnect between Child and M.D., that M.D. became frustrated when caring for Child, that he would leave Child unattended until K.B. could take care of her, and that she felt "foolish" and "stupid" for not seeing what was going on, support the jury's finding that K.B. knew or should have known that she was endangering the welfare of Child when she

left her alone in M.D.'s care. This evidence was sufficient for a jury to find that the Commonwealth established EWOC.

Additionally, K.B.'s argument that she never admitted to harming the Child while M.D. did admit that he might have done so, does not change our conclusion. There is no requirement that there be an admission to support a guilty verdict. The Commonwealth can establish its case by purely circumstantial evidence, and it was for the jury to determine the credibility of the witnesses. Moreover, the jury found K.B. guilty of EWOC, not the abuse itself. Hence, the fact that M.D. admitted to abusing the Child does not absolve her from endangering her welfare.

Based on the foregoing and our independent review, we conclude that the trial court properly found that the Commonwealth provided sufficient evidence to support its EWOC claim against K.B. It was for the jury to determine the credibility of the witnesses and it was free to believe all, some or none of the evidence and determine the weight to be afforded it. Further, although there was no direct evidence of K.B.'s knowledge, the Commonwealth can establish every element of the crime based on wholly circumstantial evidence. See Bryant, supra at 197. Hence, based on our standard of review, the jury could reasonably conclude that K.B. was aware

that the Child was in circumstances that could threaten her physical or psychological welfare and that she failed to act. K.B.'s issue lacks merit.[4]

Judgment of sentence affirmed.

_____

[4] Moreover, K.B.'s reliance on Commonwealth v. A.R.C., 150 A.3d 53 (Pa. Super. 2016), is not legally persuasive. The underlying facts, in large part, mirror the ones in this case. However, as observed by the trial court, "the similarity of the[] extensive injuries does not go to the mens rea element and is not dispositive." (Trial Court Opinion, 11/05/19, at 5). Importantly, the Superior Court's recitation of facts did not reflect that the A.R.C. jury heard extensive testimony like Dr. Wolford's and Trooper Craig's. Therefore, the jury in this matter based its verdict on different testimony. (See id); see also Bryant, supra at 197.

For example, unlike in A.M.B., Dr. Wolford provided a plethora of testimony about the signs and symptoms that Child would have displayed due to her extreme injuries, signs and symptoms of which K.B. reasonably should have been aware, and that she had a duty to investigate further. She also opined that the severe injuries experienced by Child were indicators of child abuse. Further, K.B.'s statements to Trooper Craig evidenced that she was aware of behavior by M.D. in his interactions with Child that she admitted should have caused her concern. Therefore, where the record from A.M.B. does not demonstrate that the jury reached its verdict on the same thorough testimony provided in this case, it is distinguishable and K.B.'s reliance misplaced.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/15/2020