**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MARK BORIO | : | |
| | : | |
| Appellant | : | No. 654 WDA 2023 |

Appeal from the Judgment of Sentence Entered February 21, 2023
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0008465-2021

BEFORE: PANELLA, P.J.E., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY LANE, J.:                    **FILED: October 8, 2024**

Mark Borio ("Borio") appeals from the judgment of sentence imposed following his conviction for endangering the welfare of a child (course of conduct) ("EWOC").[1]  We affirm.

The trial court summarized the pertinent trial evidence presented in this case as follows:

> At trial, . . . Adelaide Eichman[, M.D. ("Dr. Eichman")], a board-certified physician with the Child Advocacy Center of the Children's Hospital of Pittsburgh[,] testified that [Borio's seven-year-old] biological daughter [("the Child")] suffered extensive physical abuse.  While no direct evidence was presented at trial as to the identity of the abuser, the circumstantial evidence supported a strong inference that the abuser was [Borio's] then-wife, [and the Child's stepmother,] Amber Borio [("Stepmother")] . . ..
>
> The abuse occurred in 2019 and 2020 when the [C]hild was four and five years old.  During this period, the [C]hild received

---

[1] **See** 18 Pa.C.S.A. § 4304(a)(1), (b)(1)(iv), (b)(2).

medical care for a myriad of injuries including facial and head lacerations, bruises all over her face and torso, abrasions and, most seriously, in August, 2020 a broken clavicle. A number of the lacerations were serious enough to be treated with staples. On other occasions, the [C]hild presented with slap marks to her face and abrasions to her forehead and significant bruising to the left side of her face. [S]tepmother . . . accompanied her to all of the medical visits. [Stepmother] provided differing stories about the origins of the injuries[,] but she generally blamed the [C]hild for causing self-inflicted injuries.

According to Dr. Eichman, however, none of the [C]hild's injuries were consistent with self-inflicted injures. Based on the nature of the injuries and the [C]hild's young age, Dr. Eichman opined that the [C]hild's injuries were consistent with physical abuse because a significant amount of force would have been required to cause the injuries and the injuries occurred in areas that were inconsistent with self-abuse. Dr. Eichman testified that the [C]hild suffered great pain as a result of the broken clavicle and the other injures. A forensic interview was attempted but was unsuccessful[,] as [Stepmother] accompanied the [C]hild to the interview.

Janine Burtner [("Aunt")] testified that she was [Borio's] sister and that she had spoken to [Borio] about the [C]hild's welfare on various occasions during 2019 and 2020. [Aunt] testified that she did have concerns after observing bruising on the [C]hild[,] but her concerns heightened after the [C]hild had broken her clavicle. She personally observed the shoulder injury while visiting the [C]hild at [Aunt]'s mother's house. She believed the [C]hild was suffering from a broken bone and when she tried to tell [Borio] and [S]tepmother about the injury, she was told there was nothing wrong with the [C]hild. [Aunt] also observed the [C]hild with black eyes and bruises on her face on approximately ten different occasions in 2019 and 2020. She photographed those injuries and presented the photographs at trial. [Aunt] testified that she told [Borio] that "things weren't adding up" and she didn't believe that the [C]hild was injuring herself. She tried unsuccessfully on multiple occasions to convince [Borio] to take the [C]hild for medical treatment and relayed her suspicions of child abuse to [Borio, who ] scoffed at her concerns. The [C]hild continued to suffer some injuries. [Aunt] then offered to take the [C]hild and pay for the [C]hild to attend preschool near her so she could "get her into a safe

environment." She was concerned that [Borio] did nothing about what was happening to the [C]hild. [Borio] refused her offer and then refused to permit [Aunt] to see the [C]hild. After Allegheny County Children, Youth and Families intervened, the [C]hild was placed with [Aunt] and her husband. The [C]hild has suffered no injuries since that time.

Trial Court Opinion, 10/18/23, at 1-3 (paragraph breaks inserted).

The Commonwealth charged Borio with, *inter alia*, one count of EWOC.[2] The charge was graded a first-degree felony based on his alleged "course of conduct" that created a substantial risk of death or serious bodily injury to the Child, who was less than six years old. **See** 18 Pa.C.S.A. § 4304(a)(1), (b)(1)(iv), (2); **see also** Criminal Complaint, 6/30/21, at 3.

On February 21, 2023, after a bench trial during which Borio did not give testimony or submit any evidence, the trial court found him guilty of EWOC. The trial court also specifically found that Borio engaged in a course of conduct that created a substantial risk of serious bodily injury to the Child when she was under the age of six, and thus graded the conviction as a felony of the first degree. The trial court then immediately imposed a sentence of three years' probation. Borio timely filed a post-sentence motion, which the trial court denied. Borio then filed a timely notice of appeal, and both he and the trial court complied with Pa.R.A.P. 1925.

Borio raises the following issues for our review:

1. Whether the evidence was insufficient to convict . . . Borio of [EWOC], where the Commonwealth failed to prove, beyond a

_____

[2] The Commonwealth also charged Borio with two counts of aggravated assault but withdrew both of those charges before trial. **See** 18 Pa.C.S.A. § 2702(a)(1), (9).

reasonable doubt, that he acted knowingly, or that he was aware that [the C]hild was in circumstances that threatened her physical welfare?

2. Whether the trial court imposed an illegal sentence in grading [EWOC] as a first-degree felony, where the Commonwealth failed to prove, beyond a reasonable doubt, that . . . Borio engaged in a course of conduct that created a substantial risk of death or serious bodily injury?

Borio's Brief at 5 (unnecessary capitalization omitted).

In Borio's first claim, he avers the evidence was insufficient to support his EWOC conviction. A challenge to the sufficiency of the evidence presents a question of law and thus is subject to plenary review under a *de novo* standard. ***See Commonwealth v. Coniker***, 290 A.3d 725, 733 (Pa. Super. 2023). We are tasked with determining "whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense" beyond a reasonable doubt. ***Commonwealth v. Arias***, 286 A.3d 341, 349 (Pa. Super. 2022) (citations omitted). In applying this test:

we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated, and all evidence actually received must be considered. Finally, the trier of fact, while passing upon the credibility of witnesses and the

- 4 -

weight of the evidence produced, is free to believe all, part, or none of the evidence.

***Commonwealth v. Boyer***, 282 A.3d 1161, 1171 (Pa. Super. 2022) (citations omitted).

Section 4304 of the Pennsylvania Crimes Code[3] defines EWOC, in relevant part, as follows:

A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he [or she] knowingly endangers the welfare of the child by violating a duty of care, protection, or support.

18 Pa.C.S.A. § 4304(a)(1).

This Court has established a three-part test that the Commonwealth must satisfy to prove EWOC:

(1) [t]he accused was aware of his/her duty to protect the child;

(2) [t]he accused was aware that the child was in circumstances that could threaten the child's physical or psychological welfare; and

(3) [t]he accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare.

***Commonwealth v. Bryant***, 57 A.3d 191, 197 (Pa. Super. 2012) (citation and brackets omitted). "The Commonwealth is not required to prove *mens rea* by direct evidence. Frequently[,] such evidence is not available. In such cases, the Commonwealth may rely on circumstantial evidence."

---

[3] ***See*** 18 Pa.C.S.A. §§ 101-9546.

*Commonwealth v. Beasley*, 138 A.3d 39, 48 (Pa. Super. 2016) (citation omitted).

Finally, we observe that child welfare statutes, such as EWOC, are designed to cover a broad range of conduct in order to safeguard the welfare and security of children. *See Commonwealth v. Krock*, 282 A.3d 1132, 1138 (Pa. Super. 2022) Consequently, "[s]ection 4304 is to be given meaning by reference to the common sense of the community and the broad protective purposes for which it was enacted." *Commonwealth v. Vela-Garrett*, 251 A.3d 811, 815 (Pa. Super. 2021) (*citing Commonwealth v. Taylor*, 471 A.2d 1228, 1231 (Pa. Super. 1984)).

In the present case, Borio does not contest that he owed a duty of care to the Child as the biological parent tasked with caring for her. Instead, he argues that the Commonwealth did not provide sufficient evidence that he was aware of the circumstances of her physical abuse—challenging the second prong of the EWOC test, which concerns whether the accused was aware that the child was in circumstances that could threaten the child's physical or psychological welfare. *See Bryant*, 57 A.3d at 197.

Borio contends his case is analogous to *Commonwealth v. Miller*, 600 A.2d 988 (Pa. Super. 1992), wherein this Court reversed the trial court's denial of a motion to arrest judgment imposed following mother's conviction for EWOC. In *Miller*, the father lived in a shared rooming house with others. *See id*. at 989. Father told mother that a neighbor in the rooming house had

- 6 -

agreed to watch their twenty-two-month-old child while the two went out "clubbing." *See id*. Thus, the mother left her sleeping child unattended in the father's room. *See id*. A fire broke out in the father's room, and the child died as a result. *See id*. Mother was charged with EWOC. At trial, the court specifically credited mother's testimony that she believed the father, but nonetheless found her guilty of EWOC. On appeal, this Court determined that, based on the trial court's specific credibility determination, coupled with the fact that there was no evidence presented at trial that the father was dishonest or that mother had cause to disbelieve him, the logical inference was that mother was not aware that she had left the child unattended. Accordingly, this Court concluded that because mother did not knowingly leave the child unattended and thereby endangered, the evidence was insufficient to support her conviction for EWOC.

Borio asserts that he similarly relied on Stepmother's representations and had no reason to disbelieve her. Borio claims that he left the Child in Stepmother's care and worked ten to twelve hours each day before returning home. As a result, Borio contends, he never witnessed any abuse or attended any medical visits for the Child's injuries. Instead, he claims Stepmother was present when the injuries occurred and attended the subsequent medical visits, and she told him and the doctors the same account: the Child inflicted these injuries on herself. Borio also contends that he never saw evidence that Stepmother was a dishonest person or that she was lying to him. Thus, like

the mother in **_Miller_**, Borio argues his failure to act arose from his mistaken reliance on Stepmother's representations, and he was similarly unaware of the true circumstances.

Borio also argues that his case is analogous to **_Commonwealth v. A.R.C._**, 150 A.3d 53 (Pa. Super. 2016). In **_A.R.C._**, over the first two months of the child's life, mother took her to all of her scheduled pediatric visits at which doctors determined that she was healthy and thriving. However, mother thereafter returned to work and her boyfriend, who was the child's biological father, became her primary caregiver. When the child was fifty-two days old, mother took her to the doctor because she seemed excessively fussy. The doctors told mother that the child was likely suffering from colic, a normal condition in newborn infants. When the child was two months old, mother arrived home from work to find the father applying ice to the child's swollen and red leg. **_See id_**. at 54. The couple immediately took the child to the hospital, where physicians diagnosed her with a newly- fractured femur. However, upon reviewing full-body x-rays, doctors discovered seventeen other pre-existing fractures which they determined had occurred in the last three weeks, including broken ribs and limbs, which were in some stage of healing. **_See id_**. at 55. Eventually, the father confessed to falling on the child the prior evening and dropping the child while taking her out of a car seat when the child was only a few weeks old. **_See id_**. Both parents were charged with, _inter alia_, EWOC. Following a jury trial, the jury convicted mother of

EWOC. *See id*. This Court vacated the mother's EWOC conviction because there was no evidence that mother was aware that the child had fallen out of her car seat when in father's care, or that father had ever injured the child or placed the child in risk of danger, or that the child had sustained any injuries prior to the hospital visit.

Borio claims that, like the mother in *A.R.C.*, he did not cause the injuries to the Child, and he acted just as reasonably as the mother in that case by relying on Stepmother's representations. Furthermore, Borio contends that doctors misinterpreted the Child's injuries, causing them to go undetected, just as they misdiagnosed the child's fussiness in *A.R.C.*[4]

---

[4] We note that at trial, Borio cross-examined Dr. Eichman about a dermatologist who failed to diagnose a red mark on the Child's face as a sign of abuse. *See* N.T., 2/21/23, at 55-63, 146-47. Borio argued Stepmother twice took the Child to a dermatologist, who did not report the mark as a sign of abuse, despite having a duty to report abuse. After reviewing photographs taken at these visits, Dr. Eichman concluded and testified that the mark was a slap mark caused by an adult. *See* Borio's Brief at 9, 29 (*citing* N.T., 2/21/23, at 68). The trial court credited Dr. Eichman's testimony that the Child's injuries were not self-inflicted and were instead the result of physical abuse by an adult. *See* Trial Court Opinion, 10/18/23, at 5. On appeal, Borio argues that this discrepancy cited during Dr. Eichman's cross-examination discredits her testimony. *Id*.

However, this claim raises a challenge to the weight of the evidence which Borio has not preserved for our review. *See* Pa.R.A.P. 302(a) (stating "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal"). Moreover, even if the issue were not waived, no relief would be due because we cannot reweigh the evidence or invade the trial court's credibility determinations. *See Boyer*, 282 A.3d at 1171 (stating that when reviewing a sufficiency of the evidence claim, "we may not weigh the evidence and substitute our judgment for the fact-finder").

The trial court considered Borio's sufficiency challenge and concluded that it lacked merit because there was sufficient evidence that he: (1) was aware of his duty to protect the Child; (2) was aware that the Child was in circumstances that threatened her physical welfare; and (3) failed to act to protect her. As the trial court explained:

> There is no question that [Borio], as the natural father of the [C]hild, had the ultimate duty to protect [the C]hild. The evidence was uncontroverted that the [C]hild suffered numerous physical injuries over a substantial period of time. . . . She was not capable of protecting herself from the serious injuries she sustained. The abuse appears to have started with black eyes and bruising and it progressed to a broken clavicle. The evidence further established that [Borio] failed to take any actions whatsoever to protect his daughter's welfare. He ignored obvious signs of abuse. He ignored her serious physical injuries which occurred over a course of time. He ignored the repeated medical visits.

Trial Court Opinion, 10/18/23, at 5.

Viewing the evidence in the light most favorable to the Commonwealth, and granting all reasonable inferences drawn therefrom, we conclude that the evidence was sufficient to establish that Borio knowingly violated a duty of care to the Child and failed to protect her. The evidence supports the trial court's conclusion that Borio was aware of the disturbing amount and severity of the injuries that the Child repeatedly received over a significant period of time, and that he failed to act on that knowledge and chose instead to ignore those injuries. The evidence at trial established that the Child's documented abuse occurred from 2019 to 2021. During that time, the Child sustained multiple injuries which included a broken clavicle, significant bruising on the

face, and multiple head injuries, one of which resulted in swelling behind the ear which was so concerning that doctors conducted a CT scan. As a result of these injuries, the Child endured multiple medical visits and, at one point, was treated with staples in her head.

The trial court credited the testimony of Dr. Eichman, who testified that the Child's injuries were of such a nature that they were not self-inflicted, could only have been caused by an adult, and would have caused significant pain to the Child. The trial court further credited Dr. Eichman's testimony that a reasonable caretaker would know about them simply through observation. Thus, even if Borio worked ten to twelve hours each day, he certainly would have observed her visible injuries, as he lived with the Child. Despite Stepmother's claims that the injuries were all self-inflicted, Borio presented no evidence that he observed any such behavior by the Child.

Furthermore, Borio's reliance on **Miller** and **A.R.C.** is misplaced. First, unlike in **Miller**, the trial court in this case did not accept Borio's claim that he believed Stepmother. When rendering its guilty verdict, the trial court explained the basis for Borio's conviction as follows:

> There's no evidence that [Borio] believed [Stepmother's explanation about the cause of the Child's injuries]. The evidence is that he told the same story she did. And that could've been because he believed it, . . . it could've been because he was afraid at that point that he was going to suffer consequences. There's a lot of reasons he could've said that. . . . [Under t]he totality of the circumstances, he ignored his duty to his daughter. . . . I do not believe that [Borio] believe[d] there was nothing to it. I believe [Borio was] trying to protect [his]

wife. . . . I believe [Borio was] too busy. I believe [Borio] affirmatively looked away from acting on [his] duty to that child.

N.T., 2/21/23, at 165-66.

Further, unlike the mother in **Miller**, who had no reason to disbelieve the father's representations, the trial court found that Borio had ample reason to disbelieve Stepmother's story, and should have questioned her explanations based on the Child's numerous visible injuries and Aunt's repeated expressions of concern, all of which Borio chose to ignore:

You were given multiple clues that somebody was hurting your child. And you chose to ignore them. . . . I find you guilty of this charge because you let that child suffer and be abused for a long time. Your own sister reported at least [ten] different episodes of facial damage to that child; you wouldn't listen.

*Id*.

Additionally, unlike the mother in **A.R.C.**, who proactively sought care for her child's fussiness, it was undisputed that Borio never attempted to seek any medical care for the Child despite her numerous visible injuries over a period of two years, and he expressly rejected Aunt's concerns and offers of help when she observed the Child's facial injuries and broken clavicle. These findings, when viewed in the light most favorable to the Commonwealth as the verdict winner, establish that Borio knowingly failed to take any steps to protect his minor Child, despite having ample cause and opportunity to do so. Thus, Borio's sufficiency challenge merits no relief.

In his second issue, Borio claims the evidence does not support the grading of his EWOC conviction as a first-degree felony. "[A] claim that the

[trial] court improperly graded an offense for sentencing purposes implicates the legality of a sentence." ***Commonwealth v. Hoffman***, 198 A.3d 1112, 1123 (Pa. Super. 2018) (citation omitted). Accordingly, "[o]ur standard of review is *de novo*, and the scope of our review is plenary." ***Id***.

Regarding grading, the EWOC statute provides that "[i]f the actor's conduct under subsection (a)(1) created a substantial risk of death or serious bodily injury and was part of a course of conduct, the offense constitutes a felony of the second degree." 18 Pa.C.S.A. § 4304(b)(1)(iv). Section 4304(b)(2) increases the grading to a felony of the first degree if the child was less than six years old at the time of the offense. Therefore, in order for the crime of EWOC to be graded as a first-degree felony, the Commonwealth must allege in the criminal information and present evidence at trial of the additional factor of course of conduct, and the trial court must instruct the jury on these additional factors. ***See Commonwealth v. Popow***, 844 A.2d 13, 18 (Pa. Super. 2004). The elevated grading "is designed to punish a parent who over days, weeks, or months, abuses his children[.]" ***Id***. at 17.

In the context of the EWOC statute, grading based on a course of conduct requires proof of more than one act. ***See Commonwealth v. Kelly***, 102 A.3d 1025, 1031 (Pa. Super. 2014) (*en banc*). As this Court noted in ***Kelly***:

> "Course of conduct" is defined in multiple instances elsewhere in the Crimes Code and, in each of those instances, "course of conduct" implies more than one act over time. ***See*** 18 Pa.C.S.[A.] § 2709(f) (defining "[c]ourse of conduct" as used in the statute

defining the offense of harassment as "[a] pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct"); 18 Pa.C.S.[A.] § 2709.1(f) (defining "[c]ourse of conduct" as used in the stalking statute as "[a] pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct"). Although recognizing that the harassment and stalking statutes provide a statutory definition for the phrase, this Court has "explained that '[c]ourse of conduct by its very nature requires a showing of a repetitive pattern of behavior.'"

The phrase "course of conduct" is also used in the grading of the offense of [EWOC]. 18 Pa.C.S.[A.] § 4304(b). . . . Although the EWOC statute does not define "course of conduct," the phrase is clearly used in that context to differentiate the penalties for single and multiple endangering acts.

*Id*. at 1030-31 (citations omitted); *see also* Pa.S.S.J.I. (Crim.) 15.4304B (explaining that "[a] course of conduct means a pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct").

Borio contends that the Commonwealth failed to present sufficient evidence to establish that he engaged in a course of conduct by committing multiple endangering acts. Borio claims that his sister contacted him on only two occasions to vaguely express her concerns that Stepmother's explanations did not make sense. Borio further claims that the trial court improperly relied on the Child's repeated medical visits and her severe and obvious physical injuries, noting that the medical providers accepted Stepmother's representations of Child's self-harm and never indicated that they suspected abuse. Accordingly, Borio claims because the evidence was insufficient to establish that he engaged in a course of conduct that created a substantial

risk of death or serious bodily injury to the Child, the offense was improperly graded as a first-degree felony.

The trial court considered Borio's second issue and determined that it lacked merit. The trial court reasoned:

> The [C]hild was between the ages of four and five years old at the time she suffered the abuse. . . . Rather than taking *any* steps to secure his daughter's welfare, he also repeatedly ignored his own sister's serious concerns and permitted the abuse to continue. Simply put, his own course of conduct was to avoid his paternal responsibility, a responsibility which was heightened because he was the [C]hild's only biological parent. His course of conduct created a substantial risk that [the C]hild suffered (and would continue to suffer) serious bodily injury. Rather than accepting the good will of [Aunt], his course of conduct ensured that his daughter remained with the person who was responsible for the abuse. . . .

Trial Court Opinion, 10/18/23, at 5 (emphasis in original).

Based on our review, we conclude that the trial court's factual finding that Borio engaged in a course of conduct which created a substantial risk of death or serious bodily injury to the Child, who was less than six years of age, is supported by the evidentiary record. *See* 18 Pa.C.S.A. § 4304(b)(2). Thus, Borio's challenge to the grading of the EWOC offense as a first-degree felony is meritless.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

10/8/2024