J-S39010-20
J-S39011-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| JUAN MORALES | : | |
| Appellant | : | No. 1111 EDA 2019 |

Appeal from the Judgment of Sentence Entered November 21, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0004004-2017

\*\*\*\*\*

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| JUAN MORALES | : | |
| Appellant | : | No. 1112 EDA 2019 |

Appeal from the Judgment of Sentence Entered November 21, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0004444-2017

BEFORE:   LAZARUS, J., OLSON, J., and PELLEGRINI, J.*

MEMORANDUM BY LAZARUS, J.:                      **FILED MARCH 10, 2021**

_____

* Retired Senior Judge assigned to the Superior Court.

Juan Morales appeals[1] from the judgment of sentence, entered in the Court of Common Pleas of Philadelphia County, after he was convicted by a jury of two counts of endangering the welfare of children (EWOC),[2] a third-degree felony. After careful review, we remand for resentencing.[3]

Morales was arrested in North Carolina in May 2017 on a Pennsylvania warrant issued in connection with the alleged sexual assault of two minor female twins (Child 1 and Child 2— collectively, Children).  Children, who were seven years old at the time of the alleged assaults, are the daughters of Morales' long-time paramour, N.S.[4]

Morales was charged with two counts each[5] of rape of a child, involuntary deviate sexual intercourse (IDSI), unlawful contact with a minor, aggravated indecent assault of a child, sexual assault, EWOC, corruption of minors, indecent

_____

[1] On January 2, 2020, our Court *sua sponte* consolidated the two appeals, 1111 EDA 2019 and 1112 EDA 2019.  **See** Pa.R.A.P. 513.

[2] 18 Pa.C.S.A. § 4304(a)(1).

[3] On October 29, 2020, our Court denied counsel's motion to withdraw, filed in conjunction with an **Anders**/**McClendon**/**Santiago** brief, and remanded the case for counsel to file an advocate's brief, having found that there were several non-frivolous issues in the matter.  **See Commonwealth v. Morales**, 111 EDA 2019 (Pa. Super. filed Oct. 29, 2020) (unpublished memorandum decision). Counsel complied with our directive and filed an advocate's brief on December 7, 2020.  The Commonwealth filed a responsive Appellee's brief on February 2, 2021.

[4] N.S. and Morales are the parents of a younger daughter who was an infant at the time of the alleged assaults on Children.

[5] Morales was charged under two separate docket numbers for each minor victim, CP-51-CR-0004444-2017 and CP-51-CR-0004004-2017.

exposure, indecent assault of a child less than 13 years of age, simple assault, recklessly endangering another person (REAP), and dissemination of explicit sexual materials to a minor.

The trial court set forth the relevant factual history underlying the charges as follows:

> [N.S.] testified that she was in a relationship with [Morales] and he lived in the apartment with her and her children. [N.S.] testified that she sometimes left [] Children home with [Morales] while she went to work. [N.S.] testified that on June 29, 2014[,] around 2:30 a.m., she realized that [Morales] was not in the bed next to her and walked to the living room, where she observed [Morales] on the sofa with his "penis out" and "touching himself" while [Child 1] was balled up with her arms around her knees at her chest on the other end of the couch. [N.S.] explained that she then attacked [Morales] using clenched fists, [] which [Morales] did not resist, until he pinned her down on their mattress, only allowing her to use the bathroom. [N.S.] explained that she did not call the police due to fear that [Morales] would wake up and hear her on the phone. [N.S.] testified that she was able to leave the house with [C]hildren[] after she told [Morales] she was [] going to take the[m] to the flea market. Instead of going to the flea market, [N.S.] said that she went to her mother's house[,] where she first called police and then continued on to St. Christopher's Hospital for Children[,] where she was interviewed by a police officer. On the following day, she and [Children] went to an appointment at [the] Special Victims Unit (SVU) and [] she did not talk to [Children] about what happened with [Morales] or what they were allowed to talk about. [N.S.] stated that she did not communicate or see [Morales] again at that time.
>
> [N.S.] also described moving with [C]hildren to North Carolina in March of 2015, explaining that she lived near and remained in contact with [Morales'] older sister[,] but claimed that she did not know whether [Morales] was living in North Carolina or Philadelphia. [N.S.] described the first time she saw [Morales] in 2016 at his mother's North Carolina home and how she was scared of him during this encounter.

On cross-examination, [N.S.] explained that during their relationship[,] she and [Morales] would have arguments[] around [Children], sometimes caused by [Morales'] "w[a]ndering eye for women." [N.S.] testified that before [Children] were interviewed at St. Christopher's Hospital for Children[,] she did not speak to them about what occurred with [Morales]. [N.S.] stated that the Department of Human Services (DHS) spoke to [Children] at the hospital and also visited their house.

Next, Officer Robert Caban testified that he met with [N.S.] and [Children] at St. Christopher['s] Hospital for Children in response to a reported rape in June 2014. Officer Caban recalled that [N.S.] told him about what she saw the night before regarding [Morales'] "private area out" in front of [Child 1]. Officer Caban could not recall if he spoke with [Children] directly. On cross-examination, Officer Caban stated several times that he could not recall specific details regarding his interview with [N.S.] and [Children].

[Child 1] testified that she first met [Morales] when her mom started dating him when she was six or seven. [Child 1 stated] that [Morales] started living with them when she was seven and sometimes he watched her and [Child 2] while their mother was at work. [Child 1] also testified that [Morales] touched her more than once, describing how [Morales] showed her his phone with "people having sex" on it. [She] described how [Morales] exposed his private parts to her, touched her private parts, made her put his private part in her mouth, and how he licked her private part over her underwear over the course of [a] few days. [She also] testified that [Morales] put his private part on her front private part once while she was laying down while he moved in a back and forth motion. [She further described] an incident where [Morales] put his private part in her mouth while she was alone with him in the living room. [She also] stated that she did not tell [N.S.] when these things were going on because she was scared and thought something bad might happen if she told.

[Child 1] testified that [N.S.] found out when she came downstairs while [Morales'] private part was exposed and she was on the couch with him. [She] recalled talking with a lady in a room with a camera where she told her everything that happened to her. [She] also recalled talking with a detective. On cross-examination, [Child 1] testified that when she moved to Candor, North Carolina[,] she lived with just [N.S.] and [her] sisters. [She] explained that she never told anyone at school or in her family what [Morales] was doing to her.

[Child 2] testified that she recognized [Morales] as her [baby] sister'[s] dad who lived with her when she was about seven years old and sometimes watched her when her mom was not home. [Child 2] described one day when she was home alone with [Morales], waking up in [N.S.]'s bed with [Morales'] hand inside her shorts but over her underwear, rubbing on her front private part while he forced her hand on to his exposed private part[,] moving it in a rubbing motion. [She] stated that on the same day and other days [Morales] showed her videos of men and women in various stages of undress doing "inappropriate things." She could not remember if [Morales] said anything to her while showing her the videos. [She] further testified that [Morales] placed his private part on her back private part and that she saw "slimy stuff" come out of [Morales'] private part when they were alone in the bedroom. [She] recalled speaking with police officers and telling them what happened to her. [She] testified that she never told anyone else about what [Morales] was doing because he asked her not to and that he never threatened to hurt her or her family.

On cross-examination, [Child 2] recalled after going to the hospital[,] speaking to a lady in a room with a table and chair. [She] explained that she never told any teacher, principal, crossing guard, student, police officer at school, or family member about [Morales] touching her private part. [She] recalled moving to Candor, North Carolina[,] with [N.S.] and [her] sisters and being babysat by [Morales'] sister.

Denise Wilson, Manager of Forensic Services at Philadelphia Children's Alliance (PCA), testified regarding the forensic interview process, [the interview] room, and how parents are not in the room during the interview. Portions of the PCA interviews were intermittently shown to the jury throughout Ms. Wilson's testimony. Ms. Wilson described both [Children] as being reluctant to discuss what happened for fear of making [N.S.] mad because they "told their business." On cross-examination, Ms. Wilson detailed her interactions with [Children] and how it was her opinion that the[y] wanted to give her more information instead of assuming that they were being untruthful.

Next, Detective Brian Meissler testified that he was the assigned investigator on this case and that he met [N.S.] and [Children] at St. Christopher's Hospital for Children, where he spoke to [Children] quickly and took a formal statement from [N.S.] While reviewing his handwritten statement, Detective Meissler admitted that he made a mistake on the form substituting the name Jose for [Morales'] name

Juan and that there was no mention during the interview with [N.S.] of another individual.

Detective Meissler explained that he typically writes while conducting interviews and when the interview is finished[,] he "ask[s] them to read it . . . over and sign it, and sign and date the last page." Detective Meissler explained that when he completed this interview with [N.S.] he followed this procedure with her[,] and since there were no initials where changes were made[,] he believed "she did not make any corrections." Detective Meissler recalled [Child 1's] second interview with him at the police station, noting how at the end of the interview she wrote "she sail [sic] him red hand did [sic]" above her signature. Detective Meissler stated his belief that [Child 1] was withholding information during the interview.

On cross-examination, Detective Meissler described what a rape kit is, the procedures [for] obtaining any evidence to be placed in a rape kit, and how no biological evidence of the offender was found in [Children's] rape kits. Detective Meissler explained why he continued questioning [Child 2] after she answered "no" to the question "Did [Morales] ever touch you with his penis?" testifying that it was his belief based on his 15 years of experience that she "was withholding information that she didn't want to talk about[.]" The Commonwealth [entered] two stipulations [into the record] before resting their case-in-chief[:] the first stipulation concerned the date and time [Children] were seen at St. Christopher's Hospital for Children and the second stipulation [confirmed Morales'] date of birth as October 13, 1986.

For the defense, [Morales'] current girlfriend, Samantha Rivera, testified that when she met [Morales] he was living in North Carolina with his mother and [N.S.]. Ms. Rivera stated that [N.S.] told her that the allegations against [Morales] were not true. On cross-examination, Ms. Rivera again explained that when she asked [N.S.] if the allegations against [Morales] were true, [N.S.] responded "no" and that "she could not talk about it."

Lastly, [Morales] testified that, on June 28, 2014, he attended a family party with his then-girlfriend, [N.S.], and [C]hildren. During the party, he and [N.S.] got into an altercation. [Morales] claimed that after arriving home[, N.S.] wanted to continue to argue[. I]nstead[, Morales] ignored her until he thought she was asleep while he smoked, played [X]box, and texted on his phone. After leaving the bedroom to get something to drink[,] [Morales] explained that [N.S.] confronted him with his cell phone[,] asking

him to explain text message[.  W]hen she did not like his response, [Morales alleged N.S.] swung on him and threw the phone at him, hitting him in the nose.  [Morales] continued describing how he pushed and held [N.S.] down until she calmed down and then they both went to sleep.  The next morning[, N.S.] suggested they go to [a] flea market and they all got dress[ed] to go, but [N.S.] drove off without [Morales] after he went to retrieve the baby's sippy cup.

[Morales] stated that he called [N.S.] a few times[,] but she did not answer and later he received a threatening phone call from [N.S.]'s brother[,] calling him a pedophile and threatening to kill him.  [Morales] said that he was scared so he contacted his mother to tell her what was going on and then traveled with his mother to Charlotte, North Carolina[,] where he stayed until he was arrested in 2016.  [Morales] also detailed [N.S.]'s move with [C]hildren to Candor, North Carolina[,] about five or six months after he moved to Charlotte.  During this time, he claimed that [N.S.] would visit him in his mother's home and was given a key to his mother's house.  Lastly, [Morales] stated that he never sexually assaulted [Children].

On cross-examination, [Morales] explained that[,] through family members[,] he heard that authorities were looking for him and learned about the nature of the allegations against him.  [Morales] explained that once [N.S.] and [C]hildren moved to North Carolina[,] he resumed his romantic relationship with [N.S.] and would . . . keep[] his distance from [Children].

Trial Court Opinion, 10/25/19, 2-9 (citations to notes of testimony omitted).

After a four-day jury trial held in August 2018, Morales was acquitted of all charges except two counts of EWOC; the jury specifically found that there was a "course of conduct" with regard to the EWOC charges.  **See** Verdict, 8/24/18; **see also infra** at n.17.  On November 21, 2018, the court sentenced Morales to two consecutive terms of 2½ to 5 years' imprisonment.  Morales filed post-sentence motions; they were deemed denied by operation of law.[6]  Morales

_____

[6] Although the trial court entered an order on April 2, 2019, deeming Morales' post-sentence motions denied by operation of law in case number 4444-2017, it

filed timely notices of appeal for each docket number below[7] and complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.[8]

On appeal, Morales raises the following issues for our consideration:

(1)     Did the [c]ourt err when it permitted the jury to view the videos of [C]hildren's[] [PCA] forensic interviews without holding the required *in camera* review of the evidence for reliability and where the [videos] were neither admissible as an exception to the rule against hearsay under the Tender Years [E]xception or as a recollection recorded where [C]hildren did not specifically testify that the videos accurately reflected their knowledge at the time they were made or that they were formally adopting them?

(2)     Whether the [c]ourt erred in grading the EWOC charges as felonies of the third degree where it did not instruct the jury as to the "course of conduct" factual finding that was

_____

did not enter an order denying his post-sentence motions in case number 4004-2017 until February 18, 2020, in response to our Court's rule to show cause. **See** Pa.R.Crim.P. 720(B)(3)(c). In any event, the appeal is properly before us. **See** Pa.R.A.P. 905(a)(5) (stating that premature notice of appeal shall be treated as filed on date appealable order entered). We direct the trial court to enter an order on the docket specifically denying, by operation of law, counsel's post-sentence motion in case number 4444-2017.

[7] Morales has complied with the dictates of **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), which requires the filing of "separate appeals from an order that resolves issues arising on more than one docket." **Id.** at 977. **See also Commonwealth v. Johnson**, 236 A.3d 1141 (Pa. Super. 2020) (en banc) (revisiting **Walker** holding) and **Commonwealth v. Larkin**, 235 A.3d 350 (Pa. Super. 2020) (en banc) (same).

[8] The trial court opinion inaccurately states that Morales filed a Post-Conviction Relief Act (PCRA) petition in December 2018, when, in fact, he never filed such a petition. Rather, this is a direct appeal from Morales' judgment of sentence following the denial of post-sentence motions.

necessary for grading EWOC as a [third] degree felony, thus resulting in the imposition of an illegal sentence.

(3) Whether there was sufficient evidence to prove that [Morales] was guilty of EWOC for having violated a duty of care, protection, and support, either as a misdemeanor of the first degree or as a felony of the third degree, where there was no evidence that [Morales] had endangered the [C]hildren through any non-sexual acts, where he was acquitted of the underlying sexual assault charges and where there was no reference in the [b]ills of [i]nformation that any non-sexual events formed the basis of the EWOC charges.

(4) Whether [Morales'] convictions for EWOC, either as a misdemeanor of the first degree or as a felony of the third degree, for having violated a duty of care, protection and support[,] were against the weight of the evidence where there was no evidence that any non-sexual acts endangered the children, where [Morales] was acquitted and where there was no reference in the [b]ills of [i]nformation that any non-sexual events formed the basis of the EWOC charges.

Appellant's Brief, at 6-7 (renumbered for ease of disposition).

In his first issue, Morales argues that the trial court impermissibly allowed the jury to view inadmissible forensic interviews of the Children where the trial court did not first hold a required hearing to determine whether the Children's out-of-court-statements were relevant and "provide[d a] sufficient indicia of reliability" under the Tender Years Exception. Appellant's Brief, at 32. Morales also asserts that the court erred in admitting the interviews as a prior recorded recollection, under Pa.R.E. 803.1, where neither the court nor the Commonwealth inquired as to whether either of the Children "adopt[ed]" the substance of the forensic interviews. *Id.*

[A] trial court's ruling on evidentiary questions is within the sound discretion of that court and will not be reversed absent a clear abuse of

discretion. **Commonwealth v. Delbridge**, 771 A.2d 1, 10 (Pa. Super. 2001) (citation omitted). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law." **Commonwealth v. Mickel**, 142 A.3d 870, 874 (Pa. Super. 2016).

Instantly, the Commonwealth introduced portions of the videos of the Children's PCA interviews to the jury during its direct examination of the Children's forensic interviewer, Ms. Wilson. N.T. Jury Trial, 8/22/18, at 111-26. Prior to introducing the two video DVDs of the Children's interviews, defense counsel objected to them being played with regard to Child 2, who had not yet been impeached. Counsel specifically objected on the basis that playing the video interview of Child 2 "**would be improper bolstering of her credibility**." **Id.** at 62 (emphasis added). Counsel for the Commonwealth then told the court she did not intend to admit the videos as prior consistent statements, but, rather, as statements made pursuant to the Tender Years Exception (TYE). **Id.** at 63. Immediately prior to the court admitting the evidence, defense counsel stated that his "position is that these videos have lost their relevance, because I didn't impeach the credibility of the witness." **Id.** at 66.

The Commonwealth asserts in its brief that Morales waived any objection to the admission of the evidence based on the TYE or recorded recollection. Appellee's Brief, at 10. We are constrained to agree. Any objection counsel raised at trial regarding the lack of relevancy of the evidence, **see id.** at 66, did not apply to the admission of the evidence under the TYE or as a recorded

recollection. [9] *See* Pa.R.A.P. 302(a).  Moreover, counsel failed to raise any issue

regarding admission of the evidence under the TYE[10] or recorded recollection in

_____

[9] We similarly find no merit to the objection made by Morales's counsel at trial on the issue of admissibility of the Children's forensic interviews (the same one he raised in his Rule 1925(b) statement)—that the videos improperly bolstered the credibility of the child-victims.  Counsel was permitted to cross-examine one of the Children regarding her credibility before the videotape evidence was admitted at trial, the tape did not antedate either Child's alleged motive to lie, and the jury was able to view the videotaped interviews during deliberations— after both Children had been cross-examined.  *See Commonwealth v. Bond*, 190 A.3d 664 (Pa. Super. 2018).

[10] Even though we find that Morales has waived this issue on appeal, we admonish the Commonwealth for its failure to comply with the stringent notice requirement of section 5985.1, which states:

> **(b) Notice required**.--A statement otherwise admissible under subsection (a) shall not be received into evidence unless the proponent of the statement notifies the adverse party of the proponent's intention to offer the statement and the particulars of the statement sufficiently in advance of the proceeding at which the proponent intends to offer the statement into evidence to provide the adverse party with a fair opportunity to prepare to meet the statement.

42 Pa.C.S.A. § 5985.1(b).  "Relative to the notice requirement under this hearsay exception, the Commonwealth has the burden of providing actual notice of an intention to offer the hearsay statement."  *Commonwealth v. O'Drain*, 829 A.2d 316, 320 (Pa. Super. 2003).  The section 5985.1(b) "notice provisions are strict and must be strictly observed."  *Commonwealth v. Crossley*, 711 A.2d 1025, 1028 (Pa. Super. 1988).  Here, the Commonwealth notified Morales on the second day of *trial*, at the conclusion of Child 1's testimony, that it intended to offer the videos under the TYE.  This hardly fulfills the requirement that the "adverse party . . . [receive notice] *in advance of the proceeding at which the proponent intends to offer [it]*."  42 Pa.C.S.A. § 5985.1(b) (emphasis added).  *See Commonwealth v. Luster*, 234 A.3d 836 (Pa. Super. 2020) (forensic interview of minor victim improperly admitted, resulting in defendant's convictions and judgment of sentence being vacated and case remanded for new trial, where Commonwealth did not give formal written notice to defendant until

his Pa.R.A.P. 1925(b) statement. *See* Pa.R.A.P. 1925(b)(4)(vii). Thus, we deem the issue waived.[11]

In his next issue on appeal, Morales contends that his sentence is illegal—where the trial court sentenced him to EWOC as a third-degree felony, when the trial court did not instruct the jury on course of conduct, and where there was no factual basis presented in the bills of information to support course of conduct under section 4304.[12]

_____

day of trial that it intended to offer evidence under TYE and despite fact that Commonwealth provided oral notice of intention to present video one week before trial during plea negotiations and again during jury selection). Fortunately for the Commonwealth, Morales did not object to the lack of section 5985.1 notice, thus he has waived any alleged error. *See Commonwealth v. Cousar*, 928 A.2d 1025, 1041 (Pa. 2007) ("A party complaining, on appeal, of the admission of evidence in the court below will be confined to the specific objection there made.").

[11] The court also replayed the videos to the jury during deliberations, with no objection from counsel. *See* N.T. Jury Trial, 8/27/18, at 3, 5 (during deliberations, jury asked trial judge to view victims' recorded PCA interviews; judge complied and replayed videos). The interviews were conducted just one day after the June 29, 2014 alleged sexual assault on Child 1. The trial judge, relying on *Commonwealth v. Shelton*, 170 A.3d 549 (Pa. Super. 2017), states in his Rule 1925(a) opinion that "[a]though the victim[s were] able to testify at trial about many details of the abuse, from [its] review of the transcribed portions of the video recording, [it] discern[ed] that the victim[s] reported the event of abuse more fully, with a greater level of detail, at [their] forensic interview[s]." Trial Court Opinion, 10/25/19, at 18, citing *Shelton*, 170 A.3d at 552.

[12] In its information on bill #CP-51-CR-0004004-2017, the Commonwealth charged Morales with EWOC as Count 3, alleging that:

> On or about 04/01/2014
> On diverse dates between 2012 through 2014 the defendant[:]

A jury charge will be found adequate unless the issues are not made clear, the jury was misled by the instructions, or there was an omission from the charge amounting to a fundamental error. ***Von der Heide v. Com., Dep't of Transp.***, 718 A.2d 286, 288 (Pa. 1998). The proper grading of a defendant's convicted offense is an issue of statutory interpretation by which an appellate court determines the lawfulness of the sentence imposed. ***Commonwealth v. Reed***, 9 A.3d 1138, 1142 (Pa. 2010); ***Commonwealth v. Felder***, 75 A.3d 513, 515 (Pa. Super. 2013) (proper grading of criminal offense is issue of statutory interpretation and implicates legality of sentence imposed). As it is purely a

_____

> Being a parent, guardian, or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, the actor knowingly endangered the welfare of the complainant child by violating a duty of care, protection or support[.]
>
> **Course of Conduct**: **Notice is hereby given that the Commonwealth grades the offense as a felony of the third degree under 18 [Pa.C.S.A.] § 4304(b)[,] where there was a course of conduct of endangering the welfare of the complainant child.**

Commonwealth's Criminal Information on #4004-2017, 5/16/17, at 1 (emphasis added).

However, on bill #CP-51-CR-0004444-2017, noticeably missing from the information is any course of conduct language giving notice that the Commonwealth is grading the offense as a third-degree felony under section 4304(b). Rather, on that bill the Commonwealth lists EWOC as a third-degree felony under section 4304(a)(1) and notes that it occurred "On or about 01/01/2012 thorough 12/31/2014." Commonwealth's Criminal Information on #4444-2017, 5/16/17, at 1.

- 13 -

question of law, the appellate court's scope of review is plenary, and its standard is *de novo*. *Id.*

Under our Commonwealth's EWOC statute, 18 Pa.C.S. § 4304, an offense is graded as a first-degree misdemeanor, *id.* at § 4304(b)(1)(i), unless "the actor **engages in a course of conduct** of endangering the welfare of child" or creates a substantial risk of death or serious bodily injury, in which cases the offense is graded as a third-degree felony. *Id.* at § 4304(b)(1)(ii) (emphasis added); *Id.* at §§(b)(1)(iii). The EWOC statute does not define the term "course of conduct." *Cf.* 18 Pa.C.S.A. § 2709.1(f) (defining "[c]ourse of conduct" as used in harassment statute); *id.* (defining "course of conduct" as used in stalking statute). *See Commonwealth v. Kelly*, 102 A.3d 1025, 1031 (Pa. Super. 2014) (noting that "course of conduct" language in EWOC statute used in grading of offense, as opposed to element of offense, and pointing out that EWOC statute does not define term but that "the phrase is clearly used in that context to differentiate the penalties for single and multiple endangering acts"); *see also* 18 Pa.C.S. § 3126(b)(3)(ii) (indecent assault statute graded as third-degree felony where "[t]here has been a course of conduct of indecent assault by the person").

To support his claim, Morales cites to *Commonwealth v. Popow*, 844 A.2d 13 (Pa. Super. 2004), where the defendant was acquitted of aggravated assault charges, but convicted of simple assault, defiant trespass, REAP, stalking, and EWOC. On appeal, Popow argued that he was improperly sentenced on EWOC as a third-degree felony where "neither the information nor

the evidence made out a course of conduct that would raise this charge from a misdemeanor of the first degree to a felony of the third degree and where the jury was not instructed on a course of conduct[.]" *Id.* at 15-16. In analyzing the grading issue, our Court recognized that "'course of conduct' is not an element of the offense of endangering the welfare of a child, but it is an additional fact, a jury question, that impacts the grading of the offense." *Id.* at 18. Because EWOC was erroneously graded in the information as a third-degree felony where there were no facts alleged or proven in the case to support the grading, and because the court did not mention "course of conduct" in its EWOC instruction, our Court "conclude[d] that the trial court improperly graded this offense as a felony of the third-degree." *Id.* We remanded the case to the trial court "for imposition of a sentence within the legal sentencing range and consideration of the sentencing guidelines of this crime as a misdemeanor of the first degree, rather than as a felony of the third degree." *Id.*

The Commonwealth claims in its brief that Morales was put on notice that there would be evidence of course of conduct presented at trial where "[t]he bills of information under both docket numbers . . . charged [Morales] with third-degree felony endangerment for actions committed between 2012 and 2014." Appellee's Brief, at 17. The Commonwealth also asserts—in any event—that Morales has waived the grading claim because it does not implicate the legality of Morales' sentence and he did not object at sentencing to the improper grading. *Id.* at 20 n.3.

To support its position on waiver, the Commonwealth cites to ***Commonwealth v. Spruill***, 80 A.3d 453 (Pa. 2013), where our Supreme Court stated "to the extent that the Superior Court's decisions in [***Commonwealth v.*** ] ***Kisner***, [736 A.2d 672 (Pa. Super. 1999),] [***Commonwealth v.***] ***Passarelli***, [789 A.2d 708 (Pa. Super. 2001),] and [***Commonwealth v.***] ***Coto***, [932 A.2d 933 (Pa. Super. 2007),[13]] may be read to be inconsistent with our decision today, they must stand down." ***Id.*** at 463 n.13. Because the ***Popow*** Court relied, in

_____

[13] In ***Kisner***, the Superior Court vacated the defendant's judgment of sentence for rape as a first-degree felony and remanded for resentencing where he had not been sentenced in accordance with the grade specified in both the information and the waiver colloquy. The defendant framed his claim on appeal as an illegal sentence—one where the trial court imposed a sentence higher than that charged in the information and set forth in the waiver colloquy.

In ***Passarelli***, the defendant-father claimed that there was insufficient evidence to support his EWOC conviction where defense expert witnesses testified that injuries to his three-month-old baby could have occurred prior to the mother's departure and that the injuries could not have resulted from the defendant-father shaking the baby. On appeal, our Court concluded there was sufficient evidence to support the defendant's EWOC conviction. The defendant framed his claim on appeal as an illegal sentence—one where the sentence imposed on the charge of EWOC graded as an M-1, but where the trial court imposed a sentence on an offense lower than the offense charged in the information.

In ***Coto***, the defendant argued that there was insufficient evidence to prove he was ineligible to obtain a license to carry a concealed weapon, so the offense was improperly graded as a felony. On appeal, our Court affirmed the defendant's conviction, finding that the statutory provisions to lessen the grade of the offense were intended to be sentencing factors, not a new element of the offense and, thus, were not an affirmative defense to be proven by the prosecution. Therefore, the defendant had the burden to prove at sentencing, by a preponderance of the evidence, that the exception to lessen the grading applied.

part, on those cases, the Commonwealth contends that **Popow** is also no longer good law and, thus, Morales' claim is not a non-waivable issue.

In **Spruill**, the defendant was charged, *inter alia*, with three counts of aggravated assault. In the bills of information, the Commonwealth denoted the aggravated assault charges as "F[-]1's" (first-degree felonies); however, the description of the elements of the offense encompassed *both* first-degree and second-degree felony aggravated assault. Following a bench trial, the defendant was found guilty of F-2 aggravated assault on two of the three counts. The defendant did not object to the verdict based upon the grading of the convictions as an F-2. On direct appeal, the defendant challenged the sufficiency of the evidence to support her aggravated assault convictions as second-degree felonies; specifically, she argued that the Commonwealth abandoned the F-2 charge. **Id.** at 456. The Commonwealth countered by claiming that the defendant waived the issue by failing to object before the trial court. **Id.** at 456-57.

On appeal, our Court found that the defendant's claim was a non-waivable legality of sentence claim, examined the merits of the issue, and focused its attention on two pages of the trial transcript where the assistant district attorney said that the case involved the intent to cause serious bodily injury (F-1 language) and where the trial court and the Commonwealth agreed that they "we[]re only going on an F-1." **Id.** at 458. Our Court determined that these comments in the record established that the Commonwealth had, in fact, abandoned the F-2 charge and pursued aggravated assault only as an F-1 at

trial. *Id.* Accordingly, the panel vacated the defendant's F-2 convictions and did not address the remaining sufficiency of the evidence claim. *Id.*

After being denied reargument, the Commonwealth sought and was granted discretionary review by the Pennsylvania Supreme Court. On appeal, the Supreme Court found it necessary to clarify the "complexities" that "arise from disagreement among the members of the Court concerning whether a particular claim implicates the legality of a sentence." *Id.* at 461. First, it noted the classic and easily decipherable legality of sentence claim—where a term imposed exceeds the statutory maximum. Then, the Court proceeded to acknowledge that "the more difficult case may generate multiple expressions and even a failure to achieve a consensus." *Id.* Turning to the case at hand, the Court noted that it was faced with "the more elemental question of whether the claim posed is a sentencing claim at all." *Id.* The Court clarified that the defendant's claim involved her underlying conviction, not the actual sentence the court later imposed, finding force to the Commonwealth's argument that

> nothing on the face of the record suggest[s] a fatal problem with the sentence: the trial court delivered a guilty verdict of F[-]2 aggravated assault, and the sentence imposed was within the statutory range for such an offense. To succeed, the [defendant] needs to prove an error respecting the **verdict**, not the sentence.

*Id.* at 462 (emphasis in original). The Court stated: "Even if the challenge could be construed as implicating the sentence, this is not the sort of instance suggesting non-waivable 'illegality.'" *Id.* at 463. Accordingly, the *Spruill* Court reversed our Court's order and remanded the matter, holding that because the defendant's challenge involved her underlying conviction at trial and not the

sentence, the claim did not implicate the legality of her sentence and, thus the claim was subject to waiver. *Id.* at 463-64.

The Supreme Court also determined that when the issue involves "fact-driven matters," such as where the inquiry centers around a sufficiency argument, then it typically is not a non-waivable legality of sentence claim. *Id.* In *Spruill*, the defendant's claim specifically hinged upon "what offenses were charged and pursued, and specifically whether the Commonwealth in fact affirmatively withdrew the F2 aggravated assault charge." *Id.* We find the facts in *Spruill* are inapposite to the claim presented by Morales in the instant case.

First, while the language in **one** of the two bills of information did include the "course of conduct" language putting Morales on notice of the Commonwealth's intent to prosecute the EWOC charge as a third-degree felony, the record similarly evinces that the other bill **did not** contain the same "course of conduct" language. Second, and just as concerning, is the fact that the trial judge did not instruct the jury, before its deliberations, that Morales was being charged under a course of conduct theory in order to prove either EWOC charge as a third-degree felony—a fact that the jury is required to specifically find in order to have the offense graded as a felony. *See Popow*, *supra* at 18 ("'We cannot merely assume the jury found th[e] additional fact of [course of conduct] when no evidence of it was presented at trial **and no mention of it was made in the jury's charge**."); *see also Commonwealth v. Shamberger*, 788 A.2d 408 (Pa. Super. 2001) (en banc) (whether property taken from person is not element of theft statute, but is factor for grading purposes; "factor" is question

for jury).  **Compare** N.T. Jury Trial, 8/24/18, at 34, 43 (during jury instructions in instant case, judge only defined course of conduct with regard to indecent assault and corruption of minors charges)[14] **with Commonwealth v. Smith**, 206 A.3d 551 (Pa. Super. 2019) (where trial court instructed jury "to find that Appellant committed acts on '**numerous occasions**' that corrupted or tended to corrupt victim's morals," instruction was consistent with "course of conduct") (emphasis added and in original).

Instantly, the relevant inquiry on this issue is not what offenses were pursued by the Commonwealth at trial and whether the evidence was sufficient to prove EWOC as a third-degree felony; in fact, the issue does not bear at all on the guilt or innocence of Morales with regard to the offense.  Rather, the issue

---

[14] Specifically, the trial judge told the jury that in order for the Commonwealth to prove, beyond a reasonable doubt, that Morales committed indecent contact with the Children, the jury first had to find that Morales committed the two elements of the offense and if, and only if, it made that determination of guilt, the should jury "indicate on the verdict form whether you also find the follow[ing] elements proven beyond a reasonable doubt:  '**A, there has been a course of conduct of indecent assault**' and/or, 'B, the indecent assault was committed by touching the complainant's sexual or intimate part with sexual or intimate parts of the person.'"  N.T. Jury Trial, 8/24/18, at 34-35 (emphasis added).  The court then defined course of conduct as follows:

> A course of conduct means a pattern of actions composed of one or more act over a period of time, however short, evidencing a continuity of conduct[.]

**Id**.  Notably, the jury found that Morales was *not* guilty of indecent conduct and did not answer the question as to whether there was a course of conduct.  Verdict Report, 8/23/18.

concerns the determination of the appropriate punishment for Morales—a fact the jury must determine beyond a reasonable doubt *after* the jury has already determined that he is guilty of EWOC. Thus, the error concerns Morales' **sentence**, not the underlying conviction,[15] and, therefore, implicates the legality of his sentence. **Spruill**, **supra**. **Cf. In the Interest of D.P.**, 233 A.3d 847 (Pa. Super. 2020) (juvenile contested adjudication of delinquency for indecent assault (F-3), *not* non-waivable legality of sentence, where he argued that he had not been put on notice that Commonwealth was proceeding with such grading and that evidence was insufficient to demonstrate "course of conduct' necessary to justify F-3 grading); **Commonwealth v. Hoffman**, 198 A.3d 1112, 1123 (Pa. Super. 2018) ("[A] claim that the court improperly graded an offense for sentencing purposes implicates the legality of a sentence.") (citations and quotation marks omitted).

Undoubtedly, under the EWOC statute, in order to grade the offense as a third-degree felony, a specific determination must be made that "the actor

_____

[15] As noted earlier, the verdict sheet reflects that the jury made a specific finding that the EWOC charge was based on a "course of conduct," **see supra** at 7-8, and the jury foreperson stated same in rendering the verdict. **See** N.T. Jury Trial, 8/27/18, at 7. However, the judge never instructed the jury on "course of conduct" as it related to EWOC—an additional fact that impacts the grading of the offense. **Popow**, **supra**. Again, we find this flaw in the court's instruction led to a fundamental error necessitating remand for the proper grading of the offense as an M-3. **See Commonwealth v. Johnson**, 630 Pa. 493, 552, 107 A.3d 52, 87-88 (2014) (citation omitted) (in reviewing challenge to jury instruction, entire charge is considered, not merely discrete portions thereof; trial court free to use its own expressions **as long as the concepts at issue are clearly and accurately presented to the jury**) (emphasis added).

engaged in a course of conduct" of endangering the welfare of a child. ***Compare Reed***, ***supra*** at 642 (noting that unlawful contact with minor statute requires no factual determination of crime "for which the defendant contacted the minor" in order to determine proper grading) ***with Felder***, ***supra*** at 517 (noting that witness/victim intimidation statute "provides merely that the crime will be graded as a first-degree felony if a first-degree felony '**was charged** in the case'") (emphasis added). Here, where the trial court did not instruct the jury on "course of conduct," it was not able to determine facts to support the grading of EWOC as a third-degree felony. This amounted to a fundamental error. ***Von der Heide***, ***supra***. ***See Commonwealth v. Hartman***, 638 A.2d 968, 971 (Pa. 1994) (when court instructs jury, objective is to explain to jury how to approach its task and factors it should consider in reaching verdict). Because we cannot conclude that the jury understood that it was making a finding on course of conduct on the EWOC charge, without any instruction, the court's sentence on that offense as an F-3 is illegal. Thus, Morales is entitled to resentencing on the EWOC offenses as M-1's.

In his final two issues on appeal, Morales contends that his EWOC convictions are against the sufficiency and weight of the evidence where "he was acquitted of all sexual assault charges" and where "the jury apparently reached some type of compromise verdict [on EWOC]. . . and clear[ly] . . . did not believe that the weight of the evidence established that [Morales] engaged in any sexual behaviors toward the [C]hildren." Appellant's Brief, at 39-41. He is entitled to no relief.

A challenge to the sufficiency of the evidence presents a question of law and is subject to plenary review. ***Commonwealth v. Hitcho***, 123 A.3d 731, 746 (Pa. 2015). The test is whether the evidence admitted at trial supports the jury's finding of all the elements of the offense beyond a reasonable doubt." "The entire trial record must be evaluated and all evidence received must be considered." ***Commonwealth v. Woods***, 638 A.3d 1013, 1015 (Pa. Super. 1994) (citation omitted). "In reviewing the sufficiency of the evidence, all reasonable inferences must be drawn in favor of the Commonwealth as the verdict winner." ***Commonwealth v. Mitchell***, 902 A.2d 430, 444 (Pa. 2006).

The crime of endangering the welfare of children is defined, in relevant part, as follows:

(a) Offense defined.

(1) A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person,[16] commits an offense if he knowingly[17] endangers the welfare of the child **by violating a duty of care, protection or support.**

_____

[16] The term "person supervising the welfare of a child" means "a person other than a parent or guardian that provides care, education, training or control of a child." 18 Pa.C.S.A. § 4304(a)(3). Thus, it is undisputed that Morales, who often babysat Children while N.S. was at work during the day, fits within this definition. Again, Morales does not challenge this element of the EWOC statute.

[17] Under the Crimes Code, a person acts knowingly with respect to a material element of an offense:

- 23 -

J-S39010-20
J-S39011-20

18 Pa.C.S.A. § 4304(a)(1) (emphasis added). Pennsylvania courts have established a three-part test that must be satisfied to prove EWOC:

(1) [T]he accused [was] aware of his/her duty to protect the child;

(2) [T]he accused [was] aware that the child [was] in circumstances that could threaten the child's physical or psychological welfare; and

(3) [T]he accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare.

*Commonwealth v. Pahel*, 689 A.2d 963, 964 (Pa. Super. 1997) (quoting *Commonwealth v. Cardwell*, 515 A.2d 311, 315 (Pa. Super. 1986)).

In *Commonwealth v. Taylor*, 471 A.2d 1228 (Pa. Super. 1984), our Court discussed the legislature's intent in enacting section 4304 and its broad statutory purpose:

The Supreme Court has said that [s]**ection 4304 was drawn broadly to cover a wide range of conduct in order to safeguard the welfare and security of children. It is to be given meaning by reference to the common sense of the community and the broad protective purposes for which it was enacted.** *Commonwealth v. Mack*, [] 359 A.2d 770, 772 ([Pa.] 1976). Thus, the "common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it." *Id.*, quoting *Commonwealth v. Marlin*, [] 305 A.2d 14, 18

_____

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

18 Pa.C.S.A. §§ 302(b)(2)(i) and (ii).

([Pa.] 1973) and **Commonwealth v. Randall**, [] 133 A.2d 276, 280 ([Pa. Super.] 1957).

**Id.** at 1231 (emphasis added). **Compare Commonwealth v. Morrison**, 401 A.2d 1348 (Pa. Super. 1979) (EWOC conviction upheld on sufficiency grounds where it was based on failure of parents to take child to doctor for two months, burns on child's penis had not healed, and penis began to swell, became infected, and lack of treatment rendered loss of organ possible) **with Commonwealth v. A.R.C.**, 150 A.3d 53 (Pa. Super. 2016) (evidence insufficient to support EWOC conviction where evidence showed defendant had no idea child had sustained injuries prior to hospital visit and both defendant's boyfriend and defendant's mother testified they never saw defendant mistreat child).

Like the sufficiency argument advanced by Morales on appeal, the defendant in **Taylor**, **supra**, claimed that because a jury acquitted him of charges of assault and sexual offenses, his conviction for EWOC should be set aside. In **Taylor**, the defendant drove his thirteen-year-old daughter and her twelve-year-old friend to Ocean City, New Jersey, where the three visited the boardwalk until they returned home at approximately 10:15 P.M. **Id.** at 1229. During the car ride home, the defendant drank several beers, became tired, lost his way, and narrowly avoided two accidents. **Id.** When he became too tired to continue driving, defendant stopped at a motel room to spend the night. **Id.** According to the Commonwealth, the defendant made sexual advances to the young girls, allegedly choked them, threw them on the bed, grabbed at their private parts, and wrapped his legs around them. **Id.** The Commonwealth also presented evidence that defendant pushed his daughter's friend to the bed,

causing her to fall, strike her head, and sustain a swollen lip. *Id.* Defendant then allegedly exposed his genitalia, removed a packet of condoms from his pocket, and told his daughter that he could prevent her pregnancy by using one. *Id.* The defendant ultimately fell asleep and took the girls home the following morning, threatening to kill them if they told anyone what had happened in the motel room. *Id.*

On appeal, one of the arguments advanced by the defendant was that the jury's acquittal of the sexual offenses "was a rejection of the [victims'] testimony regarding events that allegedly occur[red] in the motel room." *Id.* at 1231. Our Court found defendant's argument meritless, noting that "a fact finder may render inconsistent verdicts," and "[a] jury's verdict in a criminal case will not be set aside merely because it appears to be inconsistent with another verdict of the jurors[, s]o long as the challenged verdict is supported by the evidence." *Id. See also Commonwealth v. Miller*, 35 A.3d 1206, 1209 (Pa. 2012) ("[T]he fact that the inconsistency [in the verdict] may be the result of lenity, coupled with the Government's inability to invoke review, suggests that inconsistent verdicts should not be reviewable.") (citation omitted).

Like the facts in *Taylor*, the affidavit of probable cause attached to the criminal complaint here alleges that the sexual encounters and viewing of explicit sexual materials formed "the facts tending to establish the grounds for the issuance of the warrant of arrest" for Morales. *See* Criminal Complaint/Affidavit of Probable Cause, 3/18/17, at 1; *see also* N.T. Jury Trial, 8/24/18, at 27 (in instruction to jury, trial court states, "If, after considering *all the evidence*, you

find that the Commonwealth has established beyond a reasonable doubt all of the elements [of EWOC], you must find the defendant guilty.") (emphasis added). Moreover, the criminal complaint, itself, predicated *all* charges upon a course of continuing sexual conduct—specifically, testimony from Children and N.S. that Morales exposed himself to Children, touched their private parts, had them perform oral sex on him, and showed them inappropriate videos of sexually explicit material. *See* N.T. Jury Trial, 8/24/18, at 21 (trial judge instructing jury that "information alleges that the crime was committed on diverse dates between January 2012 and June 2014"). Unlike *Taylor*, here the Commonwealth's case *did* focus on the sexual conduct alleged in the bills of information.

While sexual conduct formed the factual basis for all charges, including EWOC, and the jury acquitted Morales of all sexual offenses, Morales, himself, admits that this appears to be a compromise verdict situation. In such cases, we are mindful of the following:

> [T]he United States Supreme Court has recognized that a court's review of the evidentiary sufficiency of a particular conviction is separate from its review of inconsistent verdicts, as sufficiency review entails an assessment of whether the evidence was sufficient for the jury to convict a defendant of a particular offense and is "independent of the jury's determination that evidence on another count was insufficient." *United States v. Powell*, 469 U.S. 57, 67 [] (1984). Thus, **the Supreme Court has explicitly cautioned that sufficiency review "should not be confused with the problems caused by inconsistent verdicts."** *Id.* Accordingly, in line with the high Court, we emphasize that such challenges are more appropriately characterized as challenges to the inconsistency of the jury's verdict, rather than to the sufficiency of the evidence to sustain a particular conviction.

*Commonwealth v. Moore*, 103 A.3d 1240, 1242 n.3 (Pa. 2014) (emphasis added).

We conclude that the jury's acquittal of sexual offenses filed against Morales is not equivalent to a factual finding, and, therefore does not render inconsistent verdicts improper so long as there is sufficient evidence presented by the Commonwealth at trial to support the EWOC guilty verdicts. *Miller*, *supra* at 1208; *United States v. Powell*, 469 U.S. 57, 58 (1984) ("[I]nconsistent verdicts, [] under longstanding federal and state law, are allowed to stand so long as the evidence is sufficient to support the conviction."). Inconsistent verdicts are permissible, and "factual findings may not be inferred from a jury's acquittal." *Moore*, 103 A.3d at 1248. After a review of the record, we are convinced that the Commonwealth presented sufficient evidence which, if believed, would support the jury's EWOC verdict.[18] *Commonwealth v. Ketterer*, 725 A.2d 801, 804 (Pa. Super. 1999) ("Any question of doubt is for the fact-finder, unless the evidence is so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances."). Mindful of the fact that "even where two verdicts are logically inconsistent, such inconsistency alone cannot be grounds for a new trial or reversal," *Miller*, *supra* at 1213, we find no merit to Morales' sufficiency claim.

_____

[18] Morales was charged with twenty-four counts of assault and sexual offenses; the jury acquitted him of all but two counts of EWOC. Morales only contests the sufficiency of the evidence as it applies to the portion of the EWOC statute that requires the perpetrator "violat[e] a duty of care, protection or support." 18 Pa.C.S.A. § 4304(a)(1).

In his final issue, Morales contends that the verdict was against the weight of the evidence where: the jury acquitted him of all sexual assault charges, Children's mother had both a motive to fabricate and a motive to coach the [C]hildren to fabricate, there was a lack of prompt complaints, and, subsequent to the alleged incidents, the mother and Children renewed their relationship with Morales in North Carolina.[19]

"An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court." **Commonwealth v. Sullivan**, 820 A.2d 795, 805-06 (Pa. Super. 2003) (citation omitted).

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

**Commonwealth v. Mucci**, 143 A.3d 399, 410 (Pa. Super. 2016) (citation omitted). Moreover, "[i]n order for an appellant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." **Id.** (citation omitted).

Here, the Children testified that Morales exposed his private part, touched their private parts, and showed them explicit videos of a sexual nature. The fact that Children's mother may have had a motive to fabricate the events and/or coach the Children to lie about Morales' actions does not equate to an abuse of

---

[19] Morales preserved his weight of the evidence claim by including it in his post-sentence motions. **See** Pa.R.Crim.P. 607.

the trial court's discretion where it concluded that the verdict was not against the weight of the evidence. Notably, the jury as the fact finder "is free to believe all, part or none of the evidence and to determine the credibility of [the] witnesses." ***Commonwealth v. Small***, 741 A.2d 666, 672 (Pa. 1999). The jury credited the Children's testimony as truthful and did not believe the defense's claim that the allegations against Morales were fabricated. Under such circumstances, we cannot conclude that the court abused its discretion. ***See Commonwealth v. Cramer***, 195 A.3d 594, 601 (Pa. Super. 2018) (when trial court finds verdict not against weight of evidence, appellate court must give gravest consideration to trial court's conclusion because it had opportunity to hear and see evidence presented). Thus, this claim is meritless.

Judgment of sentence vacated; convictions affirmed. Case remanded for resentencing with consideration of Sentencing Guidelines for EWOC charges graded as misdemeanors of the first degree. Jurisdiction relinquished.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 3/10/2021*